## AMERICAN MOTORISTS INS. CO. v. BLACK.

### No. 4845.

Court of Civil Appeals of Texas.
Beaumont.
Nov. 20, 1952.

Rehearing Denied Jan. 7, 1953.

Orgain, Bell & Tucker, Beaumont, for appellant.

W. T. McNeill, Beaumont, E. B. Cochran, Port Neches, for appellee.

R. L. MURRAY, Justice.

This is an appeal from a judgment in the district court of Jefferson County in a Workmen's Compensation suit.

The only controversy in the trial court and on appeal is the question of the extent of disability suffered by the appellee. Black, the appellee, was a carpenter employed by the B. F. Goodrich Company at Port Neches and while working there in the course of his employment suffered an injury to his left ankle when a heavy board or timber fell on his ankle. Immediately after the injury he was treated by a physician to whom his employer took him for treatment and he returned to work after about two weeks. He continued to work at his job, doing lighter and easier phases of carpenter work on the job. He continued working for the same employer on the job until he was discharged for disobeying company orders in regard to smoking. His ankle was treated twice by the doctor to whom he was first taken and later by another doctor of the employer's selection. About a month or so after being treated by the second doctor he went to a bone specialist in Houston of his own selection who also treated him and applied to the ankle what he called an ankle corset or support.

In his petition the appellee alleged that as a result of his injury he had suffered gen-

eral disability, both partial and permanent, and in the alternative he alleged that he suffered a 50 percent permanent—partial loss of the use of his left foot. The appellant, the insurance carrier for the employer, answered by general denial and a further allegation that the injury was confined to the left foot, and later by trial amendment the appellant further alleged that appellee's incapacity was confined to the left leg and was temporary and partial only. The case was tried to a jury and upon the jury's verdict, in answer to the special issues submitted, judgment was entered in favor of appellee for 20 per cent permanent partial incapacity to his entire body.

Appellant's Points 1 and 2 complain of the sufficiency of the evidence to support the jury's finding to Special Issue No. 6, which was as follows: "Special Issue No. 6: Do you find from a preponderance of the evidence that the injury, if any, to plaintiff's left foot affected parts of his body other than the said foot, thereby causing incapacity?

Answer "Yes" or "No". The following instruction was given in connection with Special Issue No. 6:

"In answering the above issue, you are instructed that all injuries below the knee are designated as injuries to the foot. You are further instructed that an injury is not limited to the foot if it is continuing and extends to and affects other members of the body." The jury's answer to this Special Issue was "yes".

Appellant's Point No. 1 is that there was no evidence to support such issue and No. 2 is that the evidence was insufficient to support an affirmative answer to said issue.

The evidence in the statement of facts is largely the testimony of the appellee himself as to how he was hurt and as to the effects upon him of the injury. The written reports of the doctor of his selection who treated him were read into the evidence by agreement of counsel. The appellant introduced in evidence the evidence of the second doctor who treated him at the request of the employer. We set out the testimony of the appellee in detail as follows: "A: Well, this timber we were prizing apart was a big beam, four 4 by 12's spiked together, creating a beam under the floor joists of the dock. This beam was upon concrete piers, you know, and as we prized one off it fell about a distance of forty-two inches.

"Q. And it hit your left foot? A. Yes, sir.

"Q. At what place on your left foot did that beam hit? A. Hit right there on that ankle joint.

"Q. Just above that knot that sticks out on the left side of your left ankle, is that right? A. Yes, sir.

"Q. Did that beam pin your foot down to the ground, or after it hit you did it roll off of your foot? A. Well, as it, when it hit my foot I jerked my foot out from under it."

As to what effect his injury has produced, he testified:

"Q. Did you have any other trouble on account of that injury to the rest of your body? A. Yes, sir. I do and did at that time.

"Q. What was it? A. Well, I couldn't bear all my weight on that foot, you see, without being very painful, and I give to it, and when I do that I throw the extra amount of weight on my other foot. In all our work out there, practically every bit of it was on concrete floors, because they wouldn't let us walk on the grass, and just throwing this extra weight on my other foot caused this knee here to swell up and get sore and head up, this hip and just in that hip bone, in the lower part of my back right there.

"Q. Let me ask you what part of your back and body were you touching? your right side or left side? A. Right now I am touching my right side.

"Q. Did it hurt your right knee, the extra weight you threw on your right foot? A. Yes, sir.

"Q. It was your right knee that gave you trouble? A. Yes, sir, my right knee that give me trouble.

"Q. Did it swell up any and pain you? A. Yes, sir.

"Q. Did that take place soon after your foot injury, this condition you have described? A. Yes, sir.

"Q. Has that condition in your right knee and in your hip continued to the present time? A. Yes, sir.

"Q. Does it seem that those places are getting any better or used to the shift of the weight of your body? A. No, sir. They don't seem to get any better.

"Q. Does your other side hurt any? A. Yes, sir, at times this hip hurts me.

"Q. The left hip? A. Yes, sir.

"Q. Mr. Black, you say that is on account of the shifting of your weight to favor your left foot, is that right? A. That is right."

And again appellee testified as to his injury and physical condition:

"Q. Mr. Black, now when you walk up or down steps, describe how you have to hold your body, how you walk? A. Well, I can't just walk up and down steps that way.

"Q. Straight forward? A. Straight forward like anybody else.

"Q. How do you have to go up or down the steps? A. I never had thought of it in just that way, but I kind of turn myself sideways to go up and down steps.

"Q. To the left? A. Yes, sir.

"Q. Do you have to hold that left foot more or less on the level or will it bend upward and down? A. Well, it won't hardly bend up and down this way at all.

"Q. If you bend it up or down does it pain you? A. Yes, sir. That is the reason I get in that position going up and down steps.

"Q. Are you able to walk fast without having considerable pain? A. No, sir.

"Q. I will ask you just in ordinary walking along a level floor do you do it comfortably or not? A. No, sir; I have never taken a comfortable step since I was hurt.

"Q. Does that condition that you have described seem to be improving or is it static? A. I don't think, Judge, that it is any better now than it was a year ago. I

don't feel like, myself, it will ever be any better.

"Q. Is there any tenderness around your ankle any place? A. Yes, sir.

"Q. Where is it? A. It is one place right there on that ankle joint that has always been tender.

"Q. Always been tender? A. Yes sir.

"Q. That is just about that bony protrusion on the left side of your left ankle? A. Yes, sir.

"Q. Would you say in the condition you have described yourself that you would not be able to work as much in the future as you had before you sustained your injury? A. Yes, sir. It looks like I am going to have to give it up altogether.

"Q. Have you done the best you can about working? A. I certainly have.

"Q. Do you sleep well at nights? A. No, sir.

"Q. For instance, does a change in the weather make any difference in your rest? A. Yes, sir.

"Q. What would be that difference? A. Well, especially in damp weather or cold weather or a change, sudden change in the weather, I suffer lots of pain, and especially at night, with it.

"Q. How much did you weigh at the time you got hurt? A. 135.

"Q. How tall are you, Mr. Black? A. I am about five feet, nine and a half.

"Q. You weighed 135 when you were hurt. Soon after that, what did you weigh? A. I went down to 117.

"Q. What do you weigh now? A. about 120.

"Q. Did you ever have any trouble with your hip or in your right knee joint until after this? A. No, sir.

"Q. You have been a man in fine general health? A. Yes sir."

Dr. Gill, appellant's physician, testified that the X-ray showed Mr. Black suffered an incomplete fracture of the tip of the lateral malleolus.

Again Dr. Gill testified as to residual weakness in Mr. Black's left ankle caused by the injury: "A. The only objective

finding that I can find now is that he still has a little difference in the measurement of the circumference of the calf on that side. That calf is still a quarter of an inch smaller than the other one, showing he does have some residual weakness there.

"Q. You think he does have some residual weakness in the ankle there? A. Yes, sir.

"Q. You found that in the left leg? A. Yes.

"Q. That would indicate that—as I understand your testimony—you do feel there is possibly some residual disability there in that ankle? A. Yes, I believe he does have some. I thought it would heal without any complication, but he does have some."

On cross-examination by appellee, Dr. Gill testified as to the effect favoring his left ankle would have on his body.

"Q. Isn't he prone to favor his weak ankle and in doing so won't his body be shifted out of line? A. That is possible.

"Q. Won't his hip be shifted out of the normal position in favoring his left ankle? A. I don't think, actually, his hip will be shifted out of position. He would be more likely to carry excess weight on the opposite, right.

"Q. On the right side? A. Yes.

"Q. Which will cause a twist to one side, won't it? A. In other words, he would tend to bear more weight to one side, but actually there won't be a tilt to the pelvis unless there is an actual shortening there.

"Q. Isn't it true, assuming that would happen, isn't it true that his hip is liable to give him trouble, carrying that weight shifted to the right? A. Certainly, such a thing is possible, but with the small amount of atrophy that he has, I doubt it.

"Q. Well, of course, you can't tell—A. I can't tell, definitely."

And again on cross-examination, Dr. Gill said:

"Q. Either way. All right. Of course, a man having to make a living and moving around as a carpenter does, in the condition you found Mr. Black was in, will always suffer some pain from such movements, won't he? A. After a certain number of years it is natural for him to have some aches and pains.

"Q. I mean considering the condition he is in, won't that cause him to suffer some pain that he wouldn't otherwise suffer? A. I don't know. I don't know how much pain he has. He shows some evidence of atrophy or wasting of that muscle. He must have a little something in there to cause it.

"Q. Then your objective finding shows that he must favor that left foot some, doesn't it? A. To a certain extent, yes.

"Q. It certainly does and in doing that it is going to cause some other part of his body to carry that extra weight, won't it? A. That is true."

The two written reports by the appellee's doctor were as follows:

"*Examination:* The general appearance of the left foot as compared with the right upon examination revealed a mottled discoloration with generalized fullness over the dorsal aspect and near the external malleolus. Dorsiflexion or upward extension of the ankle was limited to 90 degrees which caused pain about the anterior portion of the external malleolus. 'There was pain on motion on excessive abduction and marked stiffness of the toes more so on the left than the right. There was some pain over the anterior portion of the external malleolus.' 'The pulsation of the dorsalis pedis and posterior tibial arteries on the right was good * * * and on the left was palpable but not as full. In a standing position there was no pronation of the ankles and no flattening of the arches.'

"*X-Rays:* Three X-rays of the left ankle made in this office revealed solid union of what appeared to be an incomplete fracture of the external malleolus.' * * *

"The only evidence at the time of our X-ray was a slight interruption of the cortex about one-half inch proximal to the distal end."

"*Diagnosis:* Secondary circulatory changes to the left foot, post traumatic.

"*Treatment:* We advised the patient to obtain an ankle corset.

"*Prognosis:* As far as the outlook for the future is concerned, it is my opinion that this patient at this time has a fifteen to twenty percent disability of the left foot which is based upon the circulatory changes to your foot following your injury. The injury itself, was one of a relatively minor nature, but quite frequently we will see individuals who sustain a minor injury to a foot have following circulatory changes resulting in a mild absorption of the calcium of the bones in the foot and an extreme amount of tenderness and pain which requires a long period of time to completely overcome and has to be overcome by proper support to the foot and ankle, exercises, and use. In some instances it does not completely get back to normal. In addition to the ankle corset which we prescribed, it is my opinion that the patient should use contrast foot baths to the left foot (hot and cold water) submerging the foot in first hot and then cold water, keeping it in each one for a few minutes, which will cause an opening and closing of the blood vessels and improve the circulation. I would also like to have the patient every night for five to ten minutes do some foot and toe exercises to improve the motion in some of the joints which were slightly stiff and also to improve the muscle tone and circulation. In order to properly evaluate the disability in the left foot, it will be necessary to see the patient again in about six weeks, but I would say that it will vary between ten and twenty percent.

"Respectfully submitted,
F. O. McGehee, M.D."

"To Whom It May Concern:

"Re: Walter T. Black
Port Neches, Texas

"This patient has been examined by me on only one other occasion since the original visit on February 27, 1950, and that was on June 26, 1951. He stated at that time that he was still having pain in his left foot and ankle and could not get along without his ankle corset. Examination revealed the fact that the patient still walked with a limp but there was no swelling about the left foot and ankle. There was marked tenderness on pressure over the external malleolus and only about fifty percent of normal muscle strength in the left foot. Pulsation of the dorsalis pedis artery was full and good on the left, but the posterior tibial artery was not palpable. We recommend a new ankle corset to replace his old one.

"It is my opinion that in as much as the findings of the original examination in February, 1950, are still present, this man has a 20 percent permanent partial disability to his left foot.

F. O. McGehee, M.D."

It is apparent from a study of the above evidence that the testimony by the appellee himself is the only evidence in the record to the effect that the effects of the injury to his ankle had extended to other parts of his body, his hips and his other leg, thereby causing disability. The appellant ably argues in its brief that such testimony from a layman is not sufficient to support the jury's finding that the injury extended to other parts of his body, and that this was a field of knowledge about which only an expert such as a competent physician was qualified to testify. It says this rule is especially applicable to the necessity for medical proof that such extension of injury caused disability. We have given this question a great deal of study and have concluded that in such a case as this the injured person himself is qualified to give such testimony and that such testimony is sufficient to support the jury's finding. We do this on the authority of Lumbermen's Mutual Casualty Co. v. Zinn, Tex.Civ.App., 220 S.W.2d 906, 908, writ refused. In that case the workman injured the little finger on his right hand and was awarded compensation for 135 weeks for 50 percent partial loss of the use of the

entire right hand. The contention was made there by the insurance carrier that the evidence was not sufficient to support the judgment. The court said in disposing of this contention, "We find this position is not tenable. Appellee testified that he sustained pain extending up to the knuckle joint and back into his hand, that his grip in the right hand was impaired. He also testified as to loss of strength, pains, soreness and stiffness. We overrule appellant's third point."

We have examined carefully appellant's argument that testimony by the appellee without any medical evidence to support it should not be allowed to stand as sufficient to support the above verdict by the jury. Appellant also points out that medical evidence from the one doctor of appellee's choice in regard to any extension of the injury, while obviously available to him, is entirely missing. It further argues that the only medical evidence offered by the appellee shows that the difficulty being suffered by him was by virtue of the injury to the ankle alone. We note, however, that the two reports by the appellee's doctor were in regard to examinations made February, 1950, and in June, 1951. The trial of the case began in January, 1952. Failure of two such reports to contain any medical opinion as to an extension of the injury to other parts of appellee's body can not be cause for us to assume that at the time of the trial the appellee did not have any extension of the injury to other parts of his body. The solution to the question presented by the appellant can be found only in the holding in Lumbermen's Mutual Casualty Co. v. Zinn, which is quoted above. In the absence of such holding we would be inclined to agree with the argument of the appellant. We believe, however, that the question has been settled and that medical testimony is not the only evidence by which this appellee could have made proof of the extension of the injury to his hip joints and right leg, and that such extension resulted in disability. Appellant's Points 1 and 2 are overruled.

By its third point the appellant complains of the action of the trial court in allowing the appellee over its objection to testify that he had been turned down for work after the date of his accident. The appellee had testified in answer to questions by his counsel that he had had to quit a job on account of being unable to do the work; that he had tried to get employment at other places. (He had previously testified that he had done considerable carpenter work since that time for Nicholson & Van Cleve, building contractors). He was then asked: "Have you been turned down for work and he answered, yes, sir." The appellee points out that the question itself does not ask whether he was turned down for work because of physical disabilities, but we believe from the questions immediately preceding it that the question might have been an attempt to prove by the appellee himself by hearsay evidence that because of his injury he had been turned down for work from other employers. The witness had testified at length about his activities since the accident and that he had done general carpenter work as a general carpenter when Nicholson & Van Cleve had work for him that he could do. He had also testified that he had worked for the Goodrich Company, his employer at the time of his injury, until he was discharged some six months after the injury. In the light of this other testimony we believe that the error presented was harmless error, not sufficient to require a reversal of the judgment.

By its Point No. 4 the appellant complains of the action of the trial court in refusing to submit its requested issues Nos. 3, 4, 5, and 6, inquiring as to whether or not the loss of use was confined to the left leg. This point is concerned again with the question of the sufficiency of the testimony of a layman, without any medical testimony in support thereof, to prove that the injury to the ankle had extended to and affected other portions of his body. The appellee's own testimony was to the effect that his left and right hips hurt and bothered him. The hip is regarded as part of the skeleton, as distinguished from the foot and leg. The appellant had pleaded that the appellee's injury was confined to

the left leg and it argues under this point that the evidence was such that it raised the issue under its pleadings whether the injury was confined to the left leg. We do not so regard the testimony (which is set out under Points 1 and 2), and this point is overruled.

The judgment of the trial court is affirmed.